```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION


 3

     UNITED STATES OF AMERICA,      )    Case No. 3:22-CR-84
 4                                  )
              Plaintiff,            )
 5                                  )
         VS.                        )
 6                                  )
     BRETT HANKISON,                )
 7                                  )    September 27, 2023
              Defendant.           )    Louisville, KY
 8                              *  *  *  *  *
 9               TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
              BEFORE HONORABLE REBECCA GRADY JENNINGS
10                  UNITED STATES DISTRICT JUDGE
                                *  *  *  *  *
11

     APPEARANCES:
12   For United States:        Michael J. Songer
                               Anna Gotfryd
13                             U.S. Department of Justice
                               950 Pennsylvania Avenue, NW
14                             Washington, DC 20530

15   For Defendant:           William Stewart Mathews, II
     [Defendant present.]      Dolle & Mathews CO. LPA
16                             817 Main Street, Suite 500
                               Cincinnati, OH 45202
17                             Jack Byrd
                               Law Offices of Jack Byrd
18                             545 Mainstream Dr., Suite 420
                               Nashville, TN 37228
19                             Ibrahim A. Farag
                               Farag Legal Services, PLLC
20                             440 South Seventh Street, Suite 200
                               Louisville, KY 40203
21
                      April R. Dowell, RPR, RMR, CRR
22                       Official Court Reporter
                           232 U.S. Courthouse
23                       Louisville, KY 40202
                            (502) 625-3779
24

     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

```
 1              (Begin proceedings in open court 2:25 p.m.)

 2         THE COURT:  We are going on the record in

 3    3:22-CR-84.  Can I have appearances?

 4         MR. SONGER:  Good afternoon, Your Honor.  Michael

 5    Songer for the United States.

 6         MS. GOTFRYD:  Good afternoon, Your Honor.  Anna

 7    Gotfryd for the United States.

 8         THE COURT:  All right.

 9         MR. BYRD:  Jack Byrd for Brett Hankison.

10         MR. FARAG:  Afternoon, Your Honor.  Ibrahim Farag on

11    behalf of Brett Hankison.

12         MR. MATHEWS:  Your Honor, Stew Mathews on behalf of

13    Brett Hankison.

14         THE DEFENDANT:  Good afternoon, Judge.

15         THE COURT:  Good afternoon.  Okay.  First and

16    foremost, I want to thank you all for being flexible this

17    week.  We managed to get a jury verdict last night, so I

18    appreciate you all being flexible about the timing today.  We

19    were going to get you in one way or another.  It was just

20    whether we also had a jury here at the same time, so I

21    appreciate that concession on your part.  I know we made it as

22    unknown as possible what time we were starting and yet here we

23    are about the same time we thought we were going to be, so --

24              Today I kind of want to start with the mechanics of

25    the trial and maybe some more logistical issues to go over.  I
```

1    want to discuss the jury selection process and how we're going

2    to do that and then we'll get to the motions that are

3    currently pending and we'll go through those and then any

4    other evidentiary issues that we think might come up that we

5    need to discuss today, we can do that -- we can do that as

6    well.

7            So right now the way we have this set, the trial is

8    scheduled to start October 30th, and I think the last time we

9    were here you all said four weeks-ish to try the case.  Is

10   that still how you see the evidence coming in or -- I'll ask

11   each side 'cause I'm sure there's probably some -- maybe some

12   disagreement between the two, but give me some idea of where

13   you feel you are.

14           MR. SONGER:  Your Honor, forgive me if I recall

15   incorrectly.  I think we said three weeks last time we were

16   here was our best estimate.

17           THE COURT:  Okay.

18           MR. SONGER:  Based on the current state of things

19   and conversations we've had with defense counsel, I hope that

20   it would be a little shorter than that.  I think two -- two

21   and a half weeks is probably a safe bet.

22           THE COURT:  Okay.  You all agree?

23           MR. BYRD:  We would agree with that, Your Honor.

24           THE COURT:  Okay.  Well, that may change some things

25   then.  Obviously our concern with the four weeks was we're

1  headed into a holiday, so we were kind of trying to figure out

2  how to do that.  If we're around the three-week mark,

3  obviously we can get that in really without a problem.  We do

4  have a federal holiday in there.  Veterans Day is in there.

5  We'll also have to provide jurors with additional time to go

6  vote because we do have an election day in there as well just

7  to consider as far as the timing goes.

8         All right.  If we do end up getting closer to that

9  four-week mark, the court will be closed the 22nd through the

10  24th, so that's Wednesday through Friday.  We'll also be

11  closed on Veterans Day as well.  I traditionally just -- on

12  election day, I have in the past simply either started a

13  little bit later or released a little early in order to allow

14  people to vote.  Sometimes it's a little more difficult to

15  vote in the morning just because there seem to be more crowds

16  and we want to get them in there so they can vote in the

17  evening, so we'll permit that as well.

18         I normally plan at least on the first day to see you

19  all around 9:00 o'clock in the morning and then to sort of

20  hope that we can deal with any issues first thing in the

21  morning and proceed to trial around 9:30.  That will probably

22  be the start time for a normal day.

23         That will depend a little bit on who our jury

24  actually ends up being.  We draw from a very wide swath and

25  some people have to drive up to two hours to get here each

1    day, so if we happen to have one of those people on the jury

2    panel, we'll just need to make some concessions so they're not

3    getting up terribly early to get here, so we'll try to learn

4    sort of where they're from when we get to that point and try

5    to accommodate them to the extent that we can, but we'll

6    definitely try to start each day around 9:30, and then 5:00,

7    5:30, we'll see how flexible this group happens to be as far

8    as any cutoff times that they have, but that will be kind of

9    the normal day.

10           I typically -- since we start at 9:30, we usually

11   break at 12:30 for lunch and I'll hold any other criminal

12   matters that I have during the lunch break and then we ask

13   that they come back around 1:30, do a 15-minute break in the

14   morning, 15-minute break in the afternoon.

15           All right.  So the first issue really to discuss, I

16   think, is the number of jurors that we are summoning.  So

17   right now, as I understand it, the total pool throughout the

18   whole district that's been summoned is about 750 total

19   throughout the district.  I'd say on average we lose about a

20   third to just straight unavailability.  Those will -- those

21   will go away.

22           So we still have a really big pool to select from.

23   And I wanted to -- unfortunately my computer has totally

24   frozen.  I wanted to briefly talk about how each side sees

25   that jury selection process going.

1          There are a couple of ways I think we can make it a

2    little more efficient.  One is the jury questionnaire which

3    I'm going to hand to you and hopefully we can go through

4    briefly here today.

5          Will you have somebody in the back restart my

6    computer -- hard restart -- because it is frozen.

7          So there's really two ways we could proceed on that.

8    One would be to have a pretty robust questionnaire that goes

9    out.  I am -- I've reviewed what you all have sent in and

10   I'm -- the one thing I'm not inclined to do is essentially

11   give away what the case is prior to calling people in.  I

12   don't find that to be productive, really, and it leaves far

13   too many -- far too much room for error in the long run.

14         So we've put together a fairly robust questionnaire

15   to go out and we could have a jury conference maybe the Friday

16   before with whatever question -- questionnaires that we've

17   received to that point to see if there are any challenges for

18   cause that can be made on the papers with the ultimate goal to

19   be to call about 50 jurors in for a first seating on jury

20   selection day in the morning and another 50 in the afternoon

21   with 50 additional members reserved for the next day -- the

22   next morning -- if we were to need them.  Some of that

23   obviously depends on the number of alternates we choose.

24         With two and a half weeks, my suggestion would be to

25   go with 16 jurors.  Sixteen jurors would give us four

 1    alternates, give us a little room -- breathing room.  It would

 2    allow us to use the box and nothing more than the box, so

 3    everybody would be very contained and still have all the

 4    electronics that they need up there with the screens and such.

 5    That would give 12 and 8 preemptories, respectfully, which

 6    means we'd need 36 randomly from the wheel after challenges

 7    for cause.

 8            And I'm -- I'm going to start with the defense on

 9    this.  Any thoughts you have about either the number of jurors

10    that we are looking for and alternates or the selection

11    process and the number you feel might be necessary to get that

12    clean panel?

13            MR. BYRD:  I think we're comfortable with what the

14    court is suggesting, Your Honor.

15            THE COURT:  Okay.  I don't know at the state court

16    level how big your panel was exactly, but I feel comfortable

17    that we could hopefully in two sittings on the first day get a

18    jury, but we have the backup plan of having a next day with 50

19    more if we were to not -- not have what we need.  What are

20    your thoughts on the robust questionnaire plus a jury

21    selection conference ahead of time?

22            MR. BYRD:  I think that the jury selection

23    conference would help greatly.  The questionnaire, I guess I

24    want to see how it's written and what it is.

25            THE COURT:  Okay.  Well, let -- that's a very

1    lawyerly reaction and I totally understand.  If you don't

2    mind, I've got -- these are very rough sketches -- that's for

3    them and that's for them -- of our jury questionnaire.  Now,

4    we -- we're going to be guinea pigs because we're going all

5    electronic on this for return of questionnaires which is --

6    we're hopeful.

7           Obviously, anybody who needs a paper copy will

8    receive one, but the hope would be they're going to be able to

9    respond to this questionnaire online which we haven't had the

10   ability to do before but we do now, so our intention would be

11   to have them return these.

12          In addition to what you see here, we will also be

13   including at the very beginning name, we'll be including juror

14   number which they'll receive on their information packet,

15   you'll receive their gender, their year of birth, you'll

16   receive their zip code and demographic information, so race

17   will be on there.  I'm trying to think of what the other ones

18   are until my computer comes up.

19          But those are the basic ideas.  Those questions will

20   also be included at the beginning of this.  So in addition to

21   the demographic questionnaire, the JQQ which is sent out as

22   part of the summons process, this will also include those

23   demographic questions at the time as well, so those will all

24   be responded to electronically.

25          Anyone who doesn't respond electronically will

1    either be mailed a copy of it if they ask for it in advance or

2    morning of.  Those people who are morning of, we'll do

3    everything we can to encourage them, you know, early return.

4              MR. FARAG:  How long will they have to answer the

5    questionnaire?

6              THE COURT:  Well, in some ways it depends on how

7    quick we all agree on what the questionnaire says.  Once we

8    agree on the numbers and we have a confidence level in the

9    questionnaire itself, then we'll be moving forward with

10   mailing those out.  I typically do it 30 days in advance.

11             I've had return rates that range anywhere from 95

12   percent down to 40 percent, so some of that depends on whether

13   it's summer or not, some of that depends on whether it's a

14   holiday or not, but generally speaking we've received pretty

15   good return rates and haven't had too much of a problem with

16   that.

17             So to just go through these, I'm going to kind of

18   chunk them generally.  The first couple of questions, we are

19   replacing the Covid question with more of a general

20   health-related concerns question.  We are including -- we had

21   four weeks reserved for this on the calendar, so that's why we

22   gave the longer range.  Sometimes lawyers are not the best at

23   estimating how long things are.

24             So I've cleared juries for three weeks and held them

25   for six.  They are much less happy when you do that than when

1    you say it's a four-week trial and two weeks in, you're done.

2    So we can decide on that.  I'm more inclined to clear through

3    at least three if not four weeks so that I'm not having to

4    have a poor staff member go into the jury room the week before

5    Thanksgiving and have a very awkward conversation, so we can

6    talk about how long you want in there.  This does indicate

7    when we'll be closed.

8            There are, again, a chunk of questions about

9    agencies that may be involved.  This includes a question about

10   the FBI, a question about Department of Justice, question

11   about Jefferson County District Attorney's Office, question

12   about Louisville Metro.

13           Then we have a couple of questions about involvement

14   in litigation, criminal question -- criminal litigation

15   question, a civil litigation question, a victim of crime

16   question.  And then probably once you get to page 5, I'm

17   around question ten here, we have a work in law enforcement

18   question and experience with the legal field question.

19           We have included a question in regards to television

20   programs and podcasts that are true crime or deal with law

21   enforcement primarily because there are a couple that have

22   very specific things that may be directly related to -- to

23   this case, so we have included that question.

24           We have on page 6 the jury experience questions,

25   court personnel, lawyers, and law firms.  Top of page 7, at

1    question 16, we have practice of law question, employment with

2    the government, and I think on 17 I'd like to make that

3    specific to Louisville Metro unless there is an objection to

4    that.   I'm not sure any other -- any other local or state --

5    any other local jurisdiction would be relevant.

6            MR. SONGER:  We have no objection.

7            MR. FARAG:  No objection here, Your Honor.

8            THE COURT:  Okay.  So for local, we'll make that a

9    little more specific and I'm going to make it state as in

10   Kentucky State or the federal government.  We have a

11   government agency question, we have a military question, and

12   then we have a couple of questions here about working in a job

13   that requires the carry of firearms or training in carrying or

14   operating a firearm.

15           I think both of you included some workplace

16   investigation questions, so we have -- I think I maybe tamped

17   down the question about workplace investigation or subject

18   disciplinary proceedings and just indicated whether you had

19   ever been a subject of a workplace investigation and then

20   obviously a responsibility for conducting it.

21           At 24 we sort of have the traditional philosophical

22   beliefs question; sitting in judgment of another.  We have an

23   education question.  And then we've got an employment question

24   for the individual, employment for the spouse, and a retire --

25   a retiree's question.

1          And then probably starting at question 29, the last

2     three questions may be the ones you want to look at because

3     they are a combination of maybe many, many questions that you

4     asked that I have put together into three or four questions

5     here that are a little more, maybe, case-specific or

6     topic-specific.

7          The goal here is to ask questions to get at what the

8     court's job is; to really get at a question of whether there

9     should be a challenge for cause and also to ensure that these

10    are as relevant as possible without giving away the case ahead

11    of time.  So you can comment all you want.

12          MR. FARAG:  I'd ask for permission.

13          THE COURT:  Yes, go ahead.

14          MR. FARAG:  Would it be possible to potentially

15    split 29 maybe into two questions?

16          THE COURT:  Well, it is, but it becomes very pointed

17    what you're talking about.  We're really asking as a result of

18    what you've seen in regards to these types of situations, did

19    you do anything as an affirmative action, did you go out and

20    donate to a special interest group as a result of your

21    feelings, did you publicly make any display, whether that be

22    flags, bumper stickers, anything else or did you participate

23    in any specific demonstration.

24          We could divide it in two questions, one, being more

25    about use of force and one being more about civil unrest and

1    ask the same question twice, just a little smaller.  What I

2    don't want to do is create a question where I am directly

3    pointing at one group of people.  The goal is to be more

4    general than that.  I think it encourages more dialogue and

5    encourages more responses, but I don't want to target a group

6    of people with any one question, if that makes sense.

7            MR. FARAG:  It makes perfect sense.  And the reason

8    I voiced it was maybe concerning people being confused, but I

9    think you articulated something that makes perfect sense.  We

10   have no objection with that at all.

11           THE COURT:  Okay.  Any other thoughts or ability to

12   put it into two questions?  I'm happy to wordsmith should the

13   need arise.

14           MR. SONGER:  Your Honor, on this specific point, I

15   do think it could be beneficial to ask it as two separate

16   identical questions to make sure we understand which of these

17   two distinct concepts people are responding to.

18           THE COURT:  Uh-huh.  When you say two distinct

19   concepts --

20           MR. SONGER:  The excessive use of force by law

21   enforcement versus --

22           THE COURT:  Criticisms of law.

23           MR. SONGER:  -- criticisms, yeah, civil unrest.

24           THE COURT:  Okay.  All right.  You stood up as well.

25           MR. MATHEWS:  Your Honor, my question's a little off

1    topic.  How do you conduct voir dire?  Will we be able to

2    participate in that or --

3             THE COURT:  So in the federal system, no, not

4    traditionally.  I usually conduct the voir dire from here.

5    The way I have found it most -- I guess I get the most answers

6    and the best responses is I'll ask a question -- and with the

7    exception of the questions that are, like, do you know any

8    people in the room type questions, I simply have them line up

9    and come up and speak at the bench.

10            You-all will have headsets at your seats.  They plug

11   in.  You will be able to hear the conversation from your seats

12   through the headsets.  You'll be able to hear my questions as

13   well.  I'll ask -- you know, if it's a question about have you

14   been a victim of a crime, I'll ask them tell me about your

15   experience and I will let them free speak whatever they want

16   to say.  I will ask any curative questions that might be

17   appropriate or any bias questions that might be appropriate

18   for that individual.  Before I let them go, I always say,

19   Counsel, any follow-ups?  I can hear you.  They can't.  So if

20   you have a follow-up question you'd like to ask, I'll ask it

21   or rephrase it, but I'll get that point across to them and get

22   any additional responses you'd like.

23            That's how I will say 90 percent of the voir dire is

24   done with people coming up and responding at the bench.  Most

25   people don't like to speak in front of their 50 brand new

1    friends, and I don't want something that one individual says

2    to effect the panel as a whole, so I'll ask those questions up

3    here.  You'll be able to speak any follow-up questions.  I'll

4    either ask them straight out or sometimes I may rephrase them

5    just a little bit, but I'll ask any additional questions, but

6    that's sort of how the process will go.

7        And then at the end of each roomful of people, I'll

8    tell you what I'm going to strike for cause without motion,

9    just on my own accord, the ones that I just feel there's no

10   way they answered the rehabilitation question and then I'll

11   ask you for motions for cause before they leave the room, so

12   everybody can still set eyes on them and see them.  Sometimes

13   it's hard to remember when you have big panels of people.

14       So that's how I traditionally do it.  Really the

15   only part where you'll be speaking directly to the panel is I

16   do ask you to introduce yourselves, tell them where, you know,

17   you practice law, introduce the people at your table, make

18   sure everybody can see you, those types of things.  Probably

19   not as important in your case, but usually we ask you to say

20   where you're from, if you're from E-town or J-town or wherever

21   the case may be just so people can, you know, make that

22   connection if they have one and then ask if anybody knows you

23   or anybody at your table, but that's really the only part,

24   sort of, in the federal system that most people participate

25   in.

1          I remember I did enjoy the state system where I got

2     to ask all the questions, but this is sort of the way I like

3     to do it and I do most of it up at the bench, so that's the

4     process.  And then at the end after I ask all the questions

5     I'm going to ask, I will ask you if you have any additional

6     questions you want me to ask.

7          I'll also ask you to sort of identify -- once you

8     have those questionnaire responses, if you've got somebody who

9     you're concerned about an answer and you want follow-up with

10    them, we can certainly call those numbers as they're in the

11    courtroom and address any concerns you have with their

12    questionnaires, but that is on you to sort of identify and

13    read those questionnaires ahead of time to know who you want

14    me to call up and ask additional questions of, all right?

15         MR. SONGER:  Your Honor, before we move on, could I

16    just back up a moment and address a couple big picture

17    questions about the questionnaire?

18         THE COURT:  Sure.

19         MR. SONGER:  So from the government's perspective,

20    the process sounds great and in other cases like this

21    certainly have found these questionnaires to be a big

22    timesaver in jury selection.  I do wonder if given the --

23    particularly the impact on the community in this case and by

24    both the incident and some of the things that happened

25    afterwards, if -- what we have found in other cases like that;

1   the prosecution of the officers involved in the George Floyd

2   incident, Ahmaud Arbery case in Georgia.

3        Including in the questionnaire questions that get at

4   the type of biases people have that might impact their ability

5   to fairly judge the case we have found to be a big timesaver.

6   A lot of the questions that we proposed in our -- our

7   questionnaire were modeled essentially to questions that were

8   sent out in those two cases.

9        My understanding, I think, the defense mostly agrees

10  those questions could be useful.  I wonder if including some

11  of them at least might give us a head start --

12        THE COURT:  There are a lot of yours in here.  If

13  you read them, these are a lot of your questions.  Now, there

14  were 76 questions total.  I am happy to -- if you want me to

15  look at specific ones, I'm happy to.  I am not inclined to ask

16  questions that merely get at, I don't want to say biases, but

17  there were a lot of questions in there that just asked about

18  general things; Do you contribute to these organizations?

19        That's just a general question about the person.  So

20  the reason the questions at the back here are posed the way

21  they are is they are more tailored to as a result of these

22  issues, not just a result of "I support the ACLU" generally or

23  "I support" whatever.

24        I'm asking more specific to the direct relationship

25  between these circumstances and their actions as a result of

1    it.  Whether or not they contribute to X organization does not

2    necessarily mean they have a bias.  They could contribute to

3    it for any number of reasons.  It has to be more as a result

4    of this.

5          Similarly, I think there were some questions in

6    there more generally about bumper stickers and people you

7    admire and things like that, and I'm not sure that any of

8    those questions necessarily would make someone unqualified or

9    a challenge for cause on this panel unless it were

10   specifically related to the issues here.

11         So a lot of those questions were very generalized.

12   I understand there are questions that everybody might like to

13   know the answer to, but at the same time, the question is

14   whether do they expose a bias that would be a challenge here

15   for cause, and unless you can more explain how they're

16   directly related to this case and not just a general

17   understanding of who the individual might be, I -- I'm not

18   sure I understand the necessity to ask some of those more

19   intrusive questions.

20         I'm not sure it establishes a bias whether you

21   admire X person or Y person in this case.  And so, I mean, I'm

22   happy to listen to more argument on it if there are specific

23   questions that you feel are not in here that -- or not covered

24   in someway in here that you want.

25         I'm also going to ask a lot of the bias questions in

1   here and have them up here at the bench where I can

2   rehabilitate them or ask them, you know, the rehabilitative

3   questions and know whether they can answer them or not.  I

4   worry about asking general questions like do you donate to X

5   organization without something else related here.

6           MR. SONGER:  Certainly take that point, Your Honor.

7   That makes sense.  If you can look, there is a handful we

8   might like to highlight for consideration where they're asked

9   more specifically their views on sort of hot button topics I

10  think are very relevant to whether they could fairly consider

11  the evidence in this case and the types of things that people

12  might be more comfortable answering in private that would at

13  least give us a good head start on probing whether there's a

14  bias.

15          THE COURT:  Okay.  I have -- I can pull up your

16  questions and then you can direct me -- why don't you direct

17  me to the numbers that you think have been excluded.  Do

18  you-all have a copy of their questions?

19          MR. MATHEWS:  Yes.

20          THE COURT:  Hold on one second.  Let me pull it up.

21          MR. SONGER:  It's docket 53, I believe.

22          THE COURT:  All right.  I have your questions pulled

23  up.  Go ahead and direct me to a number.

24          MR. SONGER:  I think several of them are captured in

25  some of the sort of tiered responses like question 60.

```
 1              THE COURT:  I'm getting there.  All right.

 2              MR. SONGER:  I think a number of the items that

 3    people are asked to give -- you know, we suggested a rating

 4    scale of how strongly they agree or disagree with certain

 5    concepts.  Some of these that are captured here I think are

 6    very specific to considering the issues in this case.

 7              It might be at least if not by themselves a reason

 8    to strike someone for cause.  It would at least give the court

 9    or the parties a head's up that it's something they should ask

10    about to see if there is such a bias.

11              THE COURT:  These are mainly about, (Reading) Police

12    in my community make me feel safe.  Police officers can make

13    mistakes and still be good police officers.  People today do

14    not give police officers the respect they deserve.  Police

15    officers in this country are treated fairly.

16              So let's just say they answered strongly agree to

17    any of those questions, am I going to have to voir dire them

18    anyway for bias?  Because just because I believe that police

19    officers in this country are treated unfairly doesn't mean

20    that I can't sit here and listen to the evidence in this

21    courtroom and make a determination --

22              MR. SONGER:  Certainly.

23              THE COURT:  -- so I'd have to -- I mean, all of

24    these questions would require a follow-up question, for sure.

25    I mean, maybe people who said neutral, you wouldn't need to
```

1    follow-up, but presumably if they leaned one way or another,

2    you'd have to ask a follow-up question, correct?

3            MR. SONGER:  Certainly, Your Honor.  I agree with

4    that.  A few of these might highlight -- if we were really

5    trying to narrow this down, I think are quite pointed.  For

6    example, the question about -- says police officers -- sub

7    heading (J).  Says police officers have such dangerous jobs,

8    it's not fair to second guess the decisions they make while on

9    duty.  If a person were to strongly agree with that sentiment,

10   it's a pretty clear indiction of bias.

11           There's another question later.  It's subsection (P)

12   that the federal government plays an important role in

13   protecting individual rights.  If someone strongly disagreed

14   with that assertion, that would certainly be probative of

15   bias.  I think those types of things might be more difficult

16   for people to acknowledge in open court as opposed to in the

17   privacy of where they complete the questionnaire.

18           THE COURT:  Understood.  I would still probably have

19   to call them all back up, though.  Okay.  Any thoughts on

20   those questions from your side?

21           MR. MATHEWS:  Your Honor, I was just looking through

22   your proposed questionnaire here and I think some of that is

23   covered in here already, so --

24           THE COURT:  Well, there's -- there is a question

25   about whether you've had any experiences with law enforcement.

1     There's, I believe, a question that I traditionally ask in

2     court which is more about whether they have strong feelings

3     one way or the other about law enforcement and any bias in

4     terms of judging their, you know, witnesses.  Would you tend

5     to believe the officer -- an officer's testimony over that of

6     a layperson, those types of questions that would -- that I

7     would be asking more in person than certainly on a

8     questionnaire.

9          So we will consider and relook at question 60.  Any

10    other questions that you want me to take particular note of?

11         MR. SONGER:  I'm sorry, Your Honor.  If we could

12    have just one moment to --

13         THE COURT:  Yeah, absolutely.

14         MR. FARAG:  Your Honor, if I could ask one

15    clarification while they're searching for questions.  I wasn't

16    specific enough when I asked my question about the

17    questionnaire process.  I guess I was more specifically

18    wondering how much time will a prospective juror have to

19    answer a question, let's say, once they enter information

20    online?  Is it, you know, a certain period of time you have to

21    answer it or is it at your leisure?  That's more --

22         THE COURT:  I don't know the specific answer -- I'm

23    assuming what you're asking is once I start entering my

24    information, do I have to finish it.  I'm going to suspect the

25    answer is probably yes.  I don't know -- like, I genuinely

1    don't know and can get the answer to that question.  I don't

2    know once you sort of start the input process, if there's like

3    a timer on you and you get kicked out and have to start over,

4    but I can ask that question.

5                MR. FARAG:  I understand.  And it's not a major --

6                THE COURT:  Well, if it's a 70- or 80-question

7    questionnaire, that may be a little more time that one has to

8    devote to that.  I want it to be reasonable where they're

9    actually going to answer the questions, so I think there is

10   probably a question limit on a questionnaire where people are

11   no longer really caring what they're responding to and are

12   just trying to get it done.

13               So whatever we do ask, I want it to be impactful so

14   that they actually think about it.  I mean, I agree, people

15   are much more responsive on the questionnaires and we find

16   incredibly more accurate.  Do you remember when you did your

17   last jury service?  I know I don't.  So when we ask people, it

18   gives them a moment to think about it, and so I will find out

19   if we put them on a little tick-tock clock to finish that.

20               MR. FARAG:  Even if it's just like a few days.  I

21   was just curious more than anything.  I appreciate it, Your

22   Honor.

23               THE COURT:  Once they receive the -- once they

24   receive the questionnaire, they will have a very long period

25   of weeks to respond to it.  Presumably if we agree on what the

1 questionnaire is in a reasonable period of time, they'll

2 receive that, okay, so -- yeah, I'll find out, though, and see

3 what we can do to make the process as relaxed as possible for

4 them while they're filling it out.

5     MR. FARAG:  Thank you, Your Honor.

6     THE COURT:  Yeah.

7     MR. SONGER:  So, Your Honor, in the interest of

8 brevity, to the extent that's possible for lawyers, I think

9 the only other two questions we would suggest that might be

10 pointed enough to consider are 44 and 45.

11     THE COURT:  So this first question at 44, (Reading)

12 Do you think it's okay to prosecute law enforcement officers

13 for their on-duty conduct?  And what concerns do you have, if

14 any, about the government prosecuting law enforcement

15 officers?

16    So from all of the questions I looked at in 60 as

17 I've been scrolling through and yours here, I agree with you.

18 We can create a question that is more pointed to how people

19 feel about holding individuals responsible for those on-duty

20 police officer type things 'cause a lot of the questions

21 you're asking me to look at all seem to be focused on that

22 issue which is very relevant and I think understandably both

23 sides would want a little more answers to that.

24    A lot of the other ones about how you feel about law

25 enforcement, we have a question in there that's designed to

1    get at that.  If you've had a really bad experience or a

2    really good experience too, we ask for both, but I -- I

3    understand what you're getting at and I think it's definitely

4    relevant and we can absolutely craft a question.  I'm not

5    going to do four separate questions or nine separate questions

6    for it, but I will craft one or two to try to maybe get a

7    little bit more targeted at that.  So 44 and 45.  And that is

8    really what you're getting at, right?

9            MR. SONGER:  That's right, Your Honor.  And, you

10   know, perhaps as you suggested, I think there may be a way to

11   integrate these into some of the questions we highlighted in

12   60 already.

13           THE COURT:  I think there are.  They are sort of

14   going towards the same bias, really, so I'm sure we can narrow

15   that down.  Absolutely.

16           MR. SONGER:  And just the last question I wanted to

17   raise, Your Honor, is just -- I understand the court

18   indicating that you do not want in these questionnaires to

19   include information to give people awareness of what the case

20   is about, but especially since there was a state prosecution

21   here that could be very prejudicial to the extent people know

22   about that, I think we want to know what everyone knows

23   without contaminating the rest of the jury pool.

24           THE COURT:  Obviously I don't think we're going to

25   find anyone who doesn't know anything about this case.

1    Frankly, you-all should be a little concerned that people

2    aren't in the real world if they haven't heard anything about

3    the case, so that might be reason for cause on that regard as

4    well, but -- yes, I think once we get them here in the room, I

5    think there are certainly questions we need to ask about their

6    exposure to this litigation, what they've watched or taken in.

7         Everybody's going to have some of that.  The

8    questions at the end are did you take any actions as a result

9    of that, did you feel passionate enough to do something?

10   Those are certainly part of the bias questions, but we also

11   need to learn what they've ingested and, you know, did you --

12   the podcast question was kind of intended to get at -- a

13   little bit of that too because you're going to have people

14   that may have directly ingested that.

15        News sources, obviously we can ask some questions in

16   voir dire in here about the specific case and what they've

17   learned, but telling these people ahead of time what they're

18   being called in for, I worry about that as well.  That

19   encourages people to Google, to watch court TV, to go back and

20   look at the YouTube videos of the trials, I'm sure, all of

21   those different sources, and that's what I'm really trying to

22   prevent.

23        I mean, we've had several cases in this court

24   dealing with essentially excessive use of force.  The last

25   trial I just did yesterday was an excessive use of force case,

1    so this questionnaire is designed to be broad enough to take

2    in really anything and the court's had plenty of those, and

3    the hope would be that you're not going to go Google anything

4    specific in the meantime before I have a chance to tell you

5    please don't.

6              So -- but yes, absolutely.  As far as what they've

7    ingested and the state court information, yes.  Sure.

8    Questions once they get in the courtroom, absolutely.

9              MR. SONGER:  Thank you, Your Honor.

10             THE COURT:  Okay.  And probably -- so here's what

11   I'm going to suggest on the questionnaire front so we can move

12   on to other things today.  I'm going to suggest that you take

13   a look at these questions.  I'm going to take a look at them.

14   Just because of the trial, we didn't have as much time as we'd

15   like to be able to read and edit and think, so I'm going to

16   take a look at these.

17             I'm going to add the demographic questions at the

18   top to make sure everybody's comfortable with those.  They

19   look very much like what government has asked for, but

20   probably slightly less information, but nonetheless that will

21   be in here as well.  I'll take a look at it.  You take a look

22   at it.  If you have questions, comments, thoughts about it, we

23   can always readdress those.

24             I would however on -- it's the 10th.  By the 10th I

25   would like to be able to say to the jury administrator we're

1    about ready, okay, 'cause that gives 20 days to get this

2    rolling, okay?  So the court has already sent out the initial

3    pool summons and we've already gotten back initial excuses

4    that the magistrate judges are reviewing.

5            Now we'll go to sort of the second set which is the

6    people who are actually going to receive this questionnaire

7    and they'll have 20 days to respond to those, and I think if

8    you give them too long, they lose it, if you give them too

9    short, they don't return it, so we're going for something in

10   between.  So by the time they get it, should be about 15 days

11   total for them to respond, okay?

12           So any thoughts, you know, feel free -- I'm happy to

13   listen to whatever.  I will probably have another draft of

14   these for you after I've had some time to digest more and to

15   digest our conversation here as well, and so send in comments,

16   I'll send you another draft, and we'll ask for finalization

17   via email at some point prior to the 10th when we feel like

18   we've had a chance to get everybody's comments, okay?

19           All right.  Anything else about the process?  16 or

20   18, what -- what are the thoughts from both sides, 16 or 18?

21   I think we're at -- 16 sounds reasonable to me.

22           MR. SONGER:  16 is fine with the government.

23           MR. FARAG:  Likewise, Your Honor.  We totally agree.

24           THE COURT:  Okay.  So 16.  I think total summons to

25   go out will be 200 with the hope that we can get at least some

1    that will be able to get rid of on the questionnaires with the

2    thought of pulling in -- actually calling for service 50 in

3    the morning on the 30th, 50 in the afternoon with a backup set

4    of 50 the next day in case for some reason we can't accomplish

5    it with the first set.

6            Let's plan then on scheduling a conference the

7    Friday before.  What is the Friday before?

8            THE CLERK:  27th.

9            THE COURT:  So let's do the morning.  Oh.

10           THE CLERK:  That's not a problem, I don't think.

11           THE COURT:  You don't have anything in Owensboro?

12   Okay.  So let's do Friday morning at -- is 10:00, 10:30.

13           MR. SONGER:  Happy to be here any time.

14           THE COURT:  Well, are you-all flying in?  I don't

15   want to make your lives more difficult.

16           MR. SONGER:  Your Honor, I appreciate the

17   confidence, but we will be here more than a day in advance to

18   prep the case, so whatever works for you.

19           THE COURT:  Well, I don't know.  I didn't want to

20   interfere with any plans of traveling, so -- okay.  Let's try

21   for 10:00 o'clock on the 27th and that way we can go through

22   any questionnaires you've received.  We'll give you any

23   updates on excuses.  And then the Sunday, night before the

24   Monday morning, you'll receive another email probably from

25   Ms. Morgan that will tell you any last minute excuses for

1    those people that got Covid over the weekend.  We'll let you

2    know about those as well and give you those numbers in advance

3    so you can get them out of your notebooks.

4         These will be electronic.  How are we handling the

5    yet-to-be determined because this is not going to work for

6    that.  Okay.  We're going to come up with a new plan about how

7    you're going to get them.  In accordance with the local rules,

8    you should receive them seven days in advance, but that would

9    be just the demographic information.  We're going to just put

10   it all together and try to get you the questionnaires.

11        We'll give them to you probably in chunks as we

12   receive them 'cause it may take you a little time to read

13   them, so we'll get those to you as early as we possibly can

14   sort of in shifts.  We'll just probably email them out to both

15   of them or the secured drop box.

16        THE CLERK:  The secured through CM is what we --

17        THE COURT:  Okay.  The CM?  Okay.  So it will

18   essentially be a sealed document on CM that contains the juror

19   questionnaires, so you'll receive notice that there's a new

20   document.  It will be the sealed questionnaires.  That way we

21   can take them away from you when you no longer need them and

22   people's privacy is kept safe.  Okay.  Anything else about

23   questionnaires or the voir dire process itself?

24        MR. SONGER:  No.  Thank you, Your Honor.

25        MR. BYRD:  No, Your Honor.

1          THE COURT:  Okay.  So can you do me one more favor?

2    These go over there, these go over there.  All right.  So I've

3    been told that it would be best for me to enter a decorum

4    order because we have a very small courtroom which we have

5    found to be somewhat problematic in the past, so this is a

6    decorum order that we would enter preceding the trial.

7          It essentially says that we have limited space in

8    here.  There will be no viewing in Courtroom 3 for jury

9    selection.  That will only be in Courtroom 4 which will be the

10   overflow courtroom in the basement -- not the basement, the

11   first floor.  The first floor.  It's at the loading dock.

12   It's really far in the back, so I tend to think it's the

13   basement.  It's not.

14         So Courtroom 4 is downstairs.  We don't allow cell

15   phones or anything in the courtroom.  So there is going to be

16   space on the fifth floor that will be available for anybody

17   that wants to use a laptop to take notes.  There's obviously

18   no recording.  It repeats the recording information.

19         I do need to know from you all for space purposes in

20   setting up the courtroom, one, how many people you're going to

21   have at table, and then I don't know if the victims plan on

22   attending or if you have other individuals that need reserved

23   seating on the government's side.

24         And then if there are any family members or other

25   individuals from your side that might attend the trial, we

1        would do reserved seating for those individuals as well.  And

2        then obviously if there are any individuals who have retained

3        counsel, any witnesses would have retained counsel, we also

4        have a plan to allow for them to have space in Courtroom 3 to

5        be here for the -- where they can see.

6               Courtroom 4 will have a video and audio feed.  The

7        fifth floor will also have a video and audio feed, and all the

8        same rules will be in effect for all three locations.  There

9        is a juror contacts and security section of this as well which

10       is sort of my next topic of conversation which will be -- we

11       don't have the best situation here for parking for jurors.

12              And I personally have had issues with it in

13       maintaining a jury and have had to dismiss jurors who have had

14       contacts with individuals in the parking lot, so in order to

15       try to alleviate that and a concern for any eager beavers

16       looking at people's license plates, which I've specifically

17       noted in here, we are going to come up with a parking plan for

18       those individuals who are chosen for the jury and we may even

19       be in a position where we will transport them to the

20       courthouse and bring them in the back.

21              We are working on that.  I do not have a final, but

22       I can tell you the goal would be for them not to park in the

23       same locations.  Family members and stuff parking right next

24       to jurors is not the best, so we're going to try to eliminate

25       that entirely, and I will give you any additional information

1    at that Friday conference before the trial about how we intend

2    to do that because, honestly, that's not determined quite yet.

3            So please take a look at the decorum order.  If you

4    think there's anything in here that you find objectionable or

5    you're concerned about or if there are any issues that you

6    feel we haven't thought through, let me know.

7            MR. SONGER:  Your Honor, just one thing to bring to

8    the court's attention.  Of course we have no objection to

9    there being seats set aside for the defendant's family, but we

10   would ask that there be seats for family of the victims.  A

11   number of them do plan to attend.

12           THE COURT:  That's what I was asking.  Do you know

13   how many seats you need?

14           MR. SONGER:  I don't exactly.  I would think ten

15   would be enough -- correspond the same as defense.

16           THE COURT:  Do you know how many you-all need?

17           MR. MATHEWS:  None.

18           THE COURT:  That's a valid answer too.  I'm fine

19   with it either way.  I just want to be in a position where if

20   you have individuals you want in the courtroom, that I'm not

21   excluding that.  And I think we're going to set aside some

22   spaces for your side just for -- just because.  Is that

23   reasonable?

24           MR. FARAG:  We appreciate it, Your Honor.  We might

25   have one additional person available at table.  We're not sure

1    about that yet.

2            THE COURT:  Yeah.  What I really want to know is how

3    many people do you plan on having sitting here and sitting out

4    there, so how many folks here -- do you have a paralegal or

5    anybody?

6            MR. BYRD:  Yes, Your Honor.  It would be one

7    paralegal along with the four of us that are here now.

8            THE COURT:  Okay.  Aren't we lucky we have that many

9    screens.  Okay.  That's good.  I will make sure that headsets

10   are available.  Feel free to bring your own.  Some people

11   don't like our -- you know, like what Delta gives you when you

12   get online.  You just pull them apart.  They're disposable.

13   We have those for you, but feel free to bring your own

14   headsets.  They plug in there.  I do that for bench

15   conferences as well, so you -- the time it takes you all to

16   gather your papers and come up here just never seems very

17   efficient to me, so you're going to be able to stay where you

18   are for bench conferences and stuff.

19            Obviously you need to be as quiet as humanly

20   possible sitting where you are because you're a little closer

21   to the jury, but we crank up the white noise, speak into the

22   microphone, and it should work out, and we'll have somebody to

23   check and make sure we can't hear you, but you don't seem to

24   be really the loud-spoken type, so I'm glad you're over there

25   in the corner.

1    MR. SONGER:  Terrific, Your Honor.  Just to answer

2    your question about the number of people at table, we expect

3    to have five, Ms. Gotfryd and I, one paralegal, and then if

4    it's okay with the court, I know typically we would have one

5    party representative.  We have two in this case.  Two FBI

6    agents who would like to sit at counsel table.

7            THE COURT:  Are they both witnesses?

8            MR. SONGER:  One of them is a potential witness, one

9    is not.

10           THE COURT:  Okay.

11           MR. BYRD:  I don't think we have any objection to

12   that, Your Honor.

13           THE COURT:  No.  It kind of makes you even.  And as

14   long as they're not both witnesses, I don't --

15           MR. BYRD:  For one time, it makes the defense --

16           THE COURT:  Okay.  Okay.  So we will -- I don't know

17   what we'll do.  I don't know if we'll add a table.  Some

18   things in this courtroom removable and some are not, but we'll

19   make it as nonlethal as possible for you all not to trip over

20   each other when you get up.

21           How many people do you think are going to be

22   plugging their computers in to -- to the display?  Just one,

23   probably?

24           MR. SONGER:  I think one person with two computers.

25           THE COURT:  Okay.  All right.  You'll have plenty of

1    plugs.  I'll go over technology in a minute, but I'm getting

2    out of order which means I'll miss something, so -- okay.

3    Well, we'll do technology next since you -- since it's topic.

4            So the technology in this courtroom, I don't really

5    allow any paper.  I don't like paper.  It's just not my thing.

6    If I can avoid it, I will.  So everything's going to be

7    electronic, so plug in your computers.  You can have somebody

8    here.  You can also control it yourself from the podium.  The

9    podium has a plug-in up there.

10           Feel free -- both Ms. Dowell and Ms. Morgan would be

11   happy to show you the technology in the room if you aren't

12   familiar with it.  It works pretty well.  It is the court

13   reporter here that switches back and forth between the ELMO

14   and your laptops, so just know that when you're speaking,

15   she's the one that's controlling what is seen publicly, what

16   is seen by the jury, what's seen by the witness, so try not to

17   talk when you're asking her to switch something is sort of the

18   long and short of it, but she'll control all of that.

19           So for exhibits, I'm assuming that you're both going

20   to pre-number your exhibits, is that accurate?

21           MR. SONGER:  Yes, Your Honor.

22           THE COURT:  Okay.  Pre-number your exhibits.  We

23   will ask you to either put it on the ELMO or put it on your

24   computer.  You're going to -- it will be for identification

25   purposes which tells the court reporter to bring it up for the

1    witness and counsel, not the jury.  You'll do your foundation,

2    you'll ask to admit and publish, you all will respond if you

3    have an objection, we'll admit and publish to the jury, and

4    then she turns it on to both the public monitors as well as

5    the box.

6              If there's something that shouldn't be on the public

7    monitors, you need to make that clear.  We also use the ELMO

8    for all physical evidence.  So your firearm, your bag of

9    ammunition or casings, they go on the ELMO which means

10   everybody can actually see them, and it allows a -- say you're

11   identifying a piece of evidence.  They'll be able to see it on

12   the monitor in front of them very clearly, the label that it's

13   theirs, and you can identify chain of custody that way, and

14   that's how we've done it.

15             And then obviously all of the physical evidence will

16   go back with the jury, but just so you know, we do put the

17   physical evidence on the ELMO.  It makes it big enough that

18   everybody can see it, okay?

19             All right.  I would ask that you all provide a

20   brief -- and when I mean brief, I mean, like two, three

21   sentences tops -- you know, not a novel -- statement of the

22   case that I'm going to read during voir dire.  Now, I don't

23   want it to be super detailed, but I want it to be where people

24   can identify what the case is.  That's the moment where

25   they're going to find out what they're actually here for.

1    That's my hope.

2              So please get together, talk about it, make sure you

3    all agree with what that statement of the case should be that

4    is read during the voir dire process and then provide that via

5    email to Andrea.  I would love it a full week in advance if

6    you can do that -- a full week in advance of trial.  If not,

7    I'll harass you at the meeting the Friday before.

8              Witness list and exhibit lists.  What -- are there

9    any witnesses that the government can't identify?  I assume

10   not.

11             MR. SONGER:  No one -- no one at this point, Your

12   Honor.

13             THE COURT:  So I'm going to be able to read your

14   full witness list?  The only thing I usually don't read are

15   confidential informants or people that haven't been exchanged.

16             MR. SONGER:  I don't believe there's anything that

17   fits in those categories in this case.

18             THE COURT:  Okay.  So as far as witnesses go -- and

19   you all can choose whether or not to fully identify your

20   witness list or not, but you always take the risk that

21   somebody may know your witness, so if you all want to gamble,

22   that's up to you to do, but if there is anyone's name that's

23   particularly difficult to pronounce, please provide a

24   phonetic.  I'm terrible at pronouncing names, and it does the

25   jury no good if I pronounce it horribly wrong and you're too

1    embarrassed to correct me.  Please correct me, but try to put

2    something phonetic for anybody's names I'm not going to be

3    able to pronounce, and my bar is really low on that.  I assume

4    separation of witnesses will be invoked under 615?

5            MR. SONGER:  Yes, Your Honor.

6            THE COURT:  Okay.  For you all, I mean, I'm going to

7    give you each a room; the room that's right outside here.  If

8    you need additional witness rooms to stash witnesses, kind of

9    let us know in advance.  We have plenty of rooms -- we have a

10   couple of rooms.  I shouldn't say plenty.  We have a couple

11   rooms on this floor.  Obviously you all have the sixth floor

12   as well where you can put witnesses, but just if we need extra

13   space, let us know -- let a CSO know and we'll try to

14   accommodate that.

15           MR. BYRD:  On that, Your Honor, the rooms you're

16   referring to, are those going to be available for trial

17   materials and stuff where we can secure those up?

18           THE COURT:  Yes.  So they're going to be --

19   they're -- they are actually inside the first set of double

20   doors.

21           MR. BYRD:  We've been making use of them.  Just

22   wanted to make sure we would be able to secure that area for

23   things that we have.

24           THE COURT:  If you're in it, there's a CSO here, so

25   yes.  Those doors won't be just open.

1           MR. BYRD:  Yes.

2           THE COURT:  Yeah.  Okay.  Absolutely.  Okay.  Let's

3     see.  All right.  I typically allow for the taking of notes

4     during trial by the jury.  I hand those out after your opening

5     statements and I collect them before your closing statements.

6     Any objection to note-taking by the jurors?

7           MR. SONGER:  No objection from the government.

8           MR. BYRD:  No objection, Your Honor.

9           THE COURT:  All right.  And I'm getting close to the

10    end of my list.  Let's see here.  So let's talk about some

11    discovery issues.  Do we have any 404(b) issues, any expert

12    witnesses expected at trial, or any stipulations from the

13    parties?

14          MR. SONGER:  I don't believe there are any

15    stipulations.  As we responded in our motion and told the

16    defense, we don't plan on presenting any 404(b) in our

17    case-in-chief.  There are several witnesses who are designated

18    as experts.  I don't think there's going to be any dispute

19    about whether they are experts.  They are the folks who did

20    the ballistic toolmark analysis of the evidence recovered from

21    the scene, but those are the only experts the government

22    anticipates.

23          THE COURT:  Okay.

24          MR. BYRD:  I don't believe we'll have any issues

25    with the experts they've listed; however, they do have one who

1    is a marketing manager from Walmart.  Is that gentleman still

2    anticipated to testify?

3           MR. SONGER:  He's at a different company, but yes.

4    He's an executive at a curtain manufacturing company who we do

5    expect to testify, yes.

6           MR. BYRD:  We may have an objection to the relevance

7    of his testimony about what he may testify about.  I think

8    it's going to be in connection with a specific curtain that I

9    don't believe anyone has; that it's not --

10          MR. SONGER:  Just to give the court a quick

11   background.  This is an --

12          THE COURT:  Which curtain is it?

13          MR. SONGER:  The curtain hanging on the bedroom

14   window that the defendant fired through.  We expect him to

15   give facts, testimony -- not any expert testimony offering

16   opinions about the conditions in this case, but just factual

17   background about that -- the manufacturer of that curtain, how

18   it is made and how it is tested; the specific model of curtain

19   that was hanging on the window.

20          THE COURT:  Is this the plastic part or the curtain

21   part?

22          MR. SONGER:  The actual -- the blackout curtain that

23   was hanging on --

24          THE COURT:  Not the blind?

25          MR. SONGER:  No, right.  There were -- one of them

1    there's plastic blinds and a blackout curtain behind it and

2    this is the manufacturer of the curtain.

3              THE COURT:  Okay.

4              MR. BYRD:  While we're on that, I believe the

5    manufacturer does not even call it a blackout curtain, so

6    we're going to be objecting to the use of that term by any

7    witness or during anything because it is not a blackout

8    curtain.  The company that manufactures it according to their

9    witness does not even call it a blackout curtain, so -- but

10   the fact is they don't have the curtain that he's supposedly

11   going to testify about.  It's that type.

12             THE COURT:  You mean he doesn't have a curtain or

13   the curtain?

14             MR. BYRD:  The curtain.

15             MR. SONGER:  He has -- we'll certainly lay a

16   foundation for this at trial, but he has the very specific

17   model number of the curtain that was hanging in that window

18   and his testimony is going to relate only to that exact model

19   number.  Obviously this company makes --

20             THE COURT:  The question is, like, is there an

21   actual curtain -- piece of fabric?

22             MR. SONGER:  The physical piece of fabric that was

23   hanging the night of this incident was not collected.

24             THE COURT:  Okay.  But do you have a curtain?

25             MR. SONGER:  Yes, we do.  We have an identical

1    replica.

2            THE COURT:  Okay.

3            MR. BYRD:  How can they say that if they don't have

4    the curtain that was there?

5            THE COURT:  Okay.  I think I understand.  I think

6    I'll be getting another motion is really what I've heard, yes?

7            MR. BYRD:  Yes.

8            THE COURT:  Okay.  Well, let's get that in as

9    quickly as possible, shall we?

10           MR. BYRD:  Yes, ma'am.

11           THE COURT:  Okay.  See, that's why we have this

12   conference, so I know how many more motions you're going to

13   file.  Okay.  So obviously that was a subject of some

14   contention.  Send me a motion, respond, and let's not take the

15   full time to respond and file, like -- we're kind of coming

16   down here.

17           So maybe -- maybe by the 10th when I've asked for

18   that other stuff, we can make sure that motion is filed, and

19   then you could have a little time to respond to that so that I

20   have at least a week or so before this starts to look at that

21   motion.

22           Okay.  Anything -- oh, one more thing.

23   Demonstratives and exhibits.  Have we exchanged exhibits?

24   Have we exchanged demonstratives or at least agreed that

25   you're going to exchange demonstratives?

1          MR. SONGER:  We have provided all the exhibits most

2     of which are electronic.  There are some additional physical

3     exhibits as the court knows.  The defense has inspected those.

4     We've been in contact about additional inspections that the

5     defense wants to make and we're certainly agreeable to that.

6          THE COURT:  Okay.

7          MR. SONGER:  And to the extent we have any

8     demonstratives, we'll certainly exchange them before trial.

9          THE COURT:  Okay.

10         MR. BYRD:  I would agree with those statements.  And

11    we do have some issues about 16(e) and our ability to

12    photograph some of those items.  They've spoken with us today

13    and assured us we will be able to do that, but we're going to

14    hold that in there; that 16(e) specifically says that the

15    defense is allowed to photograph and copy.

16         THE COURT:  What is 16(e)?

17         MR. BYRD:  16(e) is the rule of evidence.  And --

18         THE COURT:  Oh, I thought we were talking about an

19    exhibit.  I was, like, 16(e) you want to photograph.  Well,

20    what is 16(e) that you want to photograph?

21         MR. BYRD:  I'm sorry, Your Honor.

22         THE COURT:  That's okay.

23         MR. BYRD:  But Rule 16(e) says we can do that.  We

24    received some photographs after our initial inspection and we

25    feel that we need to take our own photographs based upon

1    those.

2              THE COURT:  So they're bad photographers is what

3    you're saying?

4              MR. BYRD:  No, they're not.  They're wonderful

5    photographers.  They're just heavily skewed towards --

6              THE COURT:  I'm sure they're not going to have a

7    problem with you taking pictures from other positions.

8    It's -- I'm assuming we can figure that out amongst ourselves.

9              MR. SONGER:  We have told defense we would be happy

10   to arrange those pictures.

11             THE COURT:  Okay.  Excellent.  All right.  So as far

12   as the exhibits go -- can I ask a question 'cause I don't have

13   your exhibits yet, obviously.  What is the quantity we're

14   talking about here?

15             MR. SONGER:  I believe there are currently 130

16   exhibits listed.  That number may change a little bit as we

17   get closer to trial, but I would expect that to be the

18   ballpark.

19             THE COURT:  And have you numbered them?

20             MR. SONGER:  They have been numbered and identified

21   by bates number and provided to the defense.

22             THE COURT:  Okay.  The only -- and you all the same?

23             MR. BYRD:  We have --

24             THE COURT:  Numbered?

25             MR. BYRD:  -- stipulated to the number.  I think our

1    number was either 12 -- 10 or 12, Your Honor.

2              THE COURT:  Okay.  The only thing I would graciously

3    ask is if you number them, number them.  If you're doing sub

4    letters, one time through the alphabet.  One time.  Not two,

5    not three, not four times through the alphabet.  I can't

6    handle it, okay?  So if you're going to admit 3ZZZ, I'm not

7    going to accept it, and I'm just telling you that now because

8    we have so much trouble keeping track.  Please one time

9    through the alphabet.  That's all I ask.

10             MR. SONGER:  No problem, Your Honor.

11             THE COURT:  All right.  So those exhibits, once

12   you've numbered them and once they've been admitted into

13   evidence, it's your responsibility to get together and put

14   those on a thumb drive that you're going to provide to

15   Ms. Dowell at the end of the trial.

16             You need to be kind to the jurors and label them in

17   some manner besides just the number to allow them to identify

18   what it is, so come up with whatever you're going to save it

19   as.  So if it's a picture, tell them it's a picture.  If it's

20   a -- you know, something very general, but please agree to it

21   ahead of time, but if you just do the exhibit numbers, you're

22   really asking for the deliberations to be much more

23   frustrating than they need to be.  So go ahead and come up

24   with labels for those, so that when you do go ahead and

25   provide those to Ms. Dowell, they're already pre-numbered,

1    pre-labeled, and the jury can find things as easily as

2    possible.

3              All right.  Anything else about logistics, jury

4    selection, anything like that before we get to motions?

5              THE CLERK:  Do you want them to provide a thumb

6    drive?

7              THE COURT:  Yeah.  They'll provide -- please provide

8    a thumb drive to Ms. Morgan with all of your exhibits on it

9    before the trial starts because if there's an objection to

10   something and we turn the white noise on, the -- these

11   monitors don't show anything, so I can bring them up on my

12   iPad and look at them while we're having that conversation,

13   but the evidence viewers don't work during the white noise, so

14   I need a copy of everything in case you have objections or

15   things come up, I'm able to review those.

16             So if you'll provide that maybe that Friday before

17   when you're here -- provide those thumb drives in person, we

18   can load them on to my iPad, okay?

19             MR. SONGER:  Your Honor, we'll do that.  Do we

20   understand you do not want us to provide a separate binder of

21   physical exhibits for the witness?

22             THE COURT:  No.  They're going to see it on the

23   monitor.  You're going to see it on the monitor.  No excess --

24   nothing can get mixed up.  You're going to show it to them

25   right from there.  They have a monitor.  This is a

1    touchscreen, so if you need people to circle things, it has an

2    arrow, it has lines, it has fancy things on it, but they can

3    draw on it and you can draw on it and it just makes it much

4    easier for the -- the jury knows they're looking at the same

5    thing that they are -- that everybody's looking at the same

6    thing and the same copy and the same clarity, okay?

7         All right.  Anything else about logistics before we

8    move on to the motions, no?

9         MR. SONGER:  No, Your Honor.

10        THE COURT:  Okay.  All right.  So in numerical

11   order, we're going to start with defendant's docket entry 40.

12   This is defendant's motion for a scene view.  I think there's

13   a request from defendant's to view the front and rear exterior

14   of 3003 Springfield Drive, Apartment 3, the front and rear

15   exterior of Apartment 4 as well, the breezeway leading into

16   both apartments, and the interior of both apartments or

17   alternatively, all the same exterior requests with no interior

18   viewing.

19        The United States responded that it was unnecessary

20   because of the volume of evidence and that key aspects had

21   been changed as well as logistical challenges.  Do you want to

22   make argument?

23        MR. FARAG:  I was going to say, Your Honor, I

24   think -- and you guys feel free to add on if you need to, but

25   the evidence displayed or provided does not accurately depict

1    the scene and we would actually welcome an in camera review of

2    the scene just to evaluate that for yourself.  It makes it

3    seem considerably more spacious than it actually is.  For that

4    reason, we don't think it actually provides a fair rendition

5    of the scene.

6              THE COURT:  Okay.

7              MR. FARAG:  And the interiors are not really that

8    essential and the structure itself remains the same.  Nothing

9    has been changed in that regard.

10             THE COURT:  Okay.  All right.

11             MR. SONGER:  Do you want me to approach or --

12             THE COURT:  If you're comfortable there, you can

13   stay there as long as you're in front of a microphone,

14   otherwise, the court reporter will not -- just sit.  You can

15   sit unless you're one of those attorneys that can't sit, and I

16   understand there are some of those who are like I have to come

17   to the podium, and if you do, that's fine.  That podium spins

18   and you can face -- face this way.

19             MR. SONGER:  I have been accused of not being able

20   to sit still in all sorts of contexts, but I will try here.

21   Just very briefly, Your Honor, I think this is laid out in our

22   motions, but the two critical points from the government's

23   perspective are, one -- or I should say there are three.  One

24   is what you alluded to; that there are actually lots of

25   evidence of what the scene looked like that night.  Not only

1   are there hundreds of pictures, there's also multiple videos

2   taken by people who literally took cameras around and showed

3   the entire scene, the parking lot, the outside, the inside, to

4   see what it's like in 3-D that night.

5           Since then significant things have changed

6   especially on the issues most critical to this case which is

7   what, if anything, could be seen through the windows the

8   defendant fired through.  There's different people in there

9   now, there's different window coverings, and I think it's

10  unavoidable that the jury sees a different setup will be stuck

11  in their mind, they won't be able to get that image out of

12  their mind, and that will be prejudicial.

13          And then the third thing is that the scene is -- as

14  much as -- of course, we'll all try.  You can never completely

15  control that kind of scene.  It's a big open apartment complex

16  and there's always a risk that the jury can be exposed to

17  something inadvertently there.  Not just hypothetical.

18  Something like that did happen during the state trial of this

19  case when the parties were on scene.

20          It was noticed there were a number of unrelated

21  shell casings around the apartment on the ground.  Nothing was

22  said about it during the trial, but it's certainly possible

23  that the jurors noticed it while they were there and we would

24  want to avoid any kind of repeat of that.

25          MR. FARAG:  Your Honor, in relation to the state

1    trial, this is all news to us.  There were no issues

2    vis-a-vis -- in that case, they were actually provided entry

3    into both apartments as well, but there was no issues in

4    relation to that or anyone interfering with the jury.

5         As far as the statement that there are videos

6    displaying the entirety of the scene, there is only one video

7    that's captured the night of that somewhat captures a portion

8    and it is incredibly low quality and it's difficult to

9    ascertain.

10        I'm not just saying that.  And, again, we do welcome

11   an in camera review so you can make that observation yourself

12   just providing the photos of the scene and you're welcome to

13   make that comparison as well.  It looks markedly different.

14        THE COURT:  Okay.  So I've taken a look at this --

15   at this particular motion.  And I am going to provide written

16   orders on them, but obviously as both sides know, the trial

17   court has a lot of discretion as to whether to allow these

18   types of things.

19        Right now the way I am looking at this situation is

20   that, yes, there are going to be differences between the way

21   it looks now and then.  Primarily I think the issue of

22   distance is something that is much more better captured by

23   people in person as opposed to on a picture or somebody

24   estimating 50 yards or whatever the case is.  Nobody estimates

25   that the same.

1          I think the views that individuals would get on the

2     ground, obviously different window coverings, that can all be

3     addressed with the jury through witnesses that things are

4     different.  I am not inclined to grant any interior of any

5     apartment.  I just don't think those are relevant to what

6     we're really here to talk about.  I'm not sure the interiors

7     are as relevant as the exteriors are.

8          As far as the issues related to logistics of a site

9     visit, certainly that is something that we would have to take

10    up with the marshals and how that would be conducted

11    specifically.  I am inclined to permit at least an exterior

12    evaluation and site visit by the jury.

13         What I would ask of the parties is that you provide

14    to the court -- if you can do it jointly, that would be

15    wonderful, if you can't, I understand -- but exactly how you

16    would foresee that site visit going; how you would conduct it,

17    where you would walk, where you would have the jurors, how

18    long it would take, how long you would allow for viewing of

19    certain things.

20         And if you can jointly agree how that would take

21    place, that would be good.  If you can't, I can resolve those

22    issues, but I'd like input from the parties as to what, if

23    anything, would be said, what if anything would be looked at,

24    and the timing of it and how that would work.

25         So I would request -- and we'll get an order out

1    next week or so on all of these, but to the extent that we're

2    going to grant that one 'cause it is discretionary, I'd like

3    to see what the proposal is.  If I were to grant just an

4    exterior site visit, I would like to hear the proposal of how

5    that would work.

6           Obviously we would have the support of the marshals

7    which is a little different than state court but similar

8    nonetheless, but we would have that support.  So I would just

9    want to know what you're proposed time line would be, how it

10   would work, what would happen during it, and how it would be

11   sort of controlled from a what-the-jurors-are-looking-at

12   perspective, okay?

13          So if you can provide that also by the 10th.  If

14   it's joint, great.  If it's not joint, I understand that.  I

15   understand that, but if it can be, fine, but just essentially

16   saying if we were to grant this, how would it work because

17   these -- the motions and responses talk about sort of the

18   merits of it, but they don't really talk about how it would

19   happen and how it would work and how it would be controlled,

20   so I would like to hear a little bit more on that issue.

21          MR. BYRD:  Your Honor, based upon obviously security

22   issues with filing a document like that, would you want that

23   via email?

24          THE COURT:  You can seal it.  Just provide it --

25          THE CLERK:  A motion to seal.

1          THE COURT:  A motion to seal has to be filed first

2    and then you file it second provisionally sealed and I'll

3    grant the motion to seal.

4          MR. BYRD:  Yes, ma'am.

5          THE COURT:  Any objection to that?

6          MR. SONGER:  No objection to the process, Your

7    Honor.

8          THE COURT:  Okay.  All right.  Well, I understand.

9    All right.  The next is Docket Entry 43 which was defendant's

10   motion to set an exhibit conference.  It sounds like this is

11   moot 'cause you've already conferred; is that accurate?

12         MR. BYRD:  As long as we're able to take our

13   photographs, Your Honor.

14         THE COURT:  Okay.  With that reservation of rights

15   which now if they don't let you take photographs, I'm

16   confident I'm going to see a very long motion with some, you

17   know --

18         MR. SONGER:  Special Agent Russell who is sitting

19   here is offended by the criticism of his photography, but we

20   will certainly make that happen.

21         THE COURT:  All right.  So I'm going to find that

22   Docket Entry 43 moot.  Then we're up to Docket Entry 44 which

23   is the motion in limine to compel notice of intent to offer.

24   This sounds like it's already been resolved, is that correct,

25   this is moot?

1              MR. SONGER:  That's correct, Your Honor.

2              MR. BYRD:  Yes, Your Honor.

3              THE COURT:  All right.  So 44 is moot.  57 is the

4     motion in limine to exclude evidence and argument regarding

5     visual depictions of the deceased and the unrelated curtain.

6     I'm assuming -- are we talking about the same curtain or

7     that's not the related curtain, correct?

8              MR. SONGER:  No, Your Honor.  I think there was a

9     misunderstanding based on how -- one of the Government

10    Exhibits was labeled.  The curtain that was the subject of

11    this motion which is the curtain hanging in Breonna Taylor's

12    bedroom which was not fired through, was not involved in this

13    incident, will not be introduced at trial.  It's not even in

14    the government's possession, so I believe that portion of the

15    motion is moot and what's remaining is the second portion

16    about the pictures of the deceased.

17             THE COURT:  Okay.  We agree that the unrelated

18    curtain is moot?

19             MR. FARAG:  Yes, Your Honor.  And you addressed this

20    earlier.  We'll file a separate motion in regard to the other

21    curtain.

22             THE COURT:  Of the relevant curtain -- the related

23    curtain?

24             MR. BYRD:  The curtain no one has.

25             MR. FARAG:  And if I --

1            THE COURT:  We'll call it the related curtain for

2    now.  The unrelated curtain will be moot and the related

3    curtain we will hear from you all via a separate motion as to

4    their expert.  All right.  Then the photographs.  Do you want

5    to make argument on that?

6            MR. FARAG:  I think the arguments from both sides

7    are fairly clear; however, the only reservation that the

8    defendant would really request is that at the very least

9    redactions or something to that effect limiting the amount

10   that the deceased body is displayed.  That way it's not

11   prejudicial to the jury and they somehow feel like they need

12   to hold him accountable for something that he is not accused

13   of doing.  That's really the number one request.  We're not

14   asking for anything outrageous.

15           THE COURT:  Since I don't have the photos, it's a

16   little hard to rule on this particular issue.  Are the

17   photo -- I mean, do you have the photos labeled as part of

18   your exhibits?  What do they depict specifically?  I think

19   they've already -- you've already taken out autopsy photos

20   which I would have said no to you anyway because it's not

21   really relevant to the case.

22           As far as crime scene photos, I'm assuming there's

23   going to be crime scene photos and that is relevant.  There's

24   no way that's not relevant.  So I need to better understand --

25   crime scene photos are certainly relevant and are certainly

1    going to be allowed.  The question is what is specifically at

2    issue in these crime scene photographs that might make them

3    different from others.  I assume it is the deceased.  What are

4    we talking about from the government's perspective and then

5    we'll -- we can figure out where we're stand.

6              MR. SONGER:  That's right, Your Honor.  We certainly

7    tried to be very thoughtful about this.  None of the photos

8    are particularly graphic.  They're not autopsy photographs,

9    but they are crime scene photographs taken the night of the

10   shooting.  That have all sorts of evidentiary value in this

11   case.  If it's helpful to the court, I have a few of them

12   that --

13             THE COURT:  Okay.  Can you put them on the ELMO real

14   quick?  All right.  And what exhibit number is this?

15             MR. SONGER:  This is currently marked as Government

16   Exhibit 28.

17             THE COURT:  Okay.  Is there an objection to this

18   specific photo?  This is the -- I'm assuming this is the

19   hallway?

20             MR. SONGER:  Correct.  This is the view from the

21   entryway to the apartment looking down the hallway.

22             THE COURT:  Okay.

23             MR. FARAG:  No, Your Honor.

24             THE COURT:  Huh?

25             MR. FARAG:  No, Your Honor.

```
 1            THE COURT:  Okay.  So there's no objection to this

 2    one.

 3            MR. SONGER:  Another very similar one taken from

 4    just outside the doorway where officers breached the door.

 5            THE COURT:  Is that just a really bad photo or do we

 6    need to adjust --

 7            MR. SONGER:  The quality doesn't look great in the

 8    printed version here.

 9            THE COURT:  Okay.  You have this on your computer,

10    though.  The color will be better.  All right.  Do you have

11    any -- what is the number on that one?

12            MR. SONGER:  It's Exhibit 21.

13            THE COURT:  Any objection to that one?

14            MR. FARAG:  No, Your Honor.

15            THE COURT:  Okay.

16            MR. SONGER:  This is Exhibit 57.

17            THE COURT:  Maybe you could turn it the other way.

18    All right.  This is looking where?

19            MR. SONGER:  This is a closer-up view of the end of

20    the hallway.  One of several evidentiary -- evidentiary

21    significance.  One is you can see the bullet holes here in the

22    wall just behind the deceased body which shows where and how

23    she was shot and seized which is critical for the Fourth

24    Amendment analysis.

25            You can also see just to the right of her body in
```

1   relation to the bedroom where I think I expect her boyfriend

2   to testify and narrate the events of this night, and he'll be

3   describing where they were located in relation to this bedroom

4   and so this picture will be important for us to corroborating

5   his testimony.

6          THE COURT:  Where is the window?

7          MR. SONGER:  The window in this picture I believe is

8   through -- it would be at the bottom right of the screen.  If

9   you kept going straight off -- off the page to the right,

10  there's another bedroom you barely see the entrance of it

11  here, and that is the window -- the far wall of that bedroom

12  is a window and that's the window the defendant fired in and

13  those are the shots that came right across the top of

14  Ms. Taylor and her boyfriend.

15         THE COURT:  So those bullet holes are from whom?

16         MR. SONGER:  These -- the bullet holes we can see

17  behind Ms. Taylor are fired by officer -- the two officers in

18  the doorway.

19         THE COURT:  Okay.  Because this is the hallway?

20         MR. SONGER:  Correct.  It's coming down.

21         THE COURT:  Okay.  I'm following.

22         MR. SONGER:  The significance of those is that

23  she -- she was almost immediately seized when those shots hit

24  her for Fourth Amendment purposes.  After she had been seized,

25  the defendant fired shots across right over her and that's the

1    force that is charged as being excessive, and for Fourth

2    Amendment purposes, she must have been seized before those

3    shots were fired --

4            THE COURT:  Understood.

5            MR. SONGER:  -- and so that's the significance.

6            THE COURT:  This is Exhibit 57.  Any objection to

7    57?

8            MR. BYRD:  Well, Your Honor, first, you would have

9    to accept the theory that Mr. Hankison fired after she was

10   down.  We don't believe that will be the testimony.  This

11   picture is only showing the rounds that went from the other

12   officers.  It's not showing any rounds that were fired by

13   Mr. Hankison.

14           We would object to this just because of the blood

15   and everything that's right there and it gives the impression

16   that Mr. Hankison was firing at somebody that was on the

17   ground.  We contend that -- and that's part of the whole case,

18   what it is; did he fire after she was down?  We believe the

19   testimony's going to be that he did not.  And the positioning

20   of her is at issue because Mr. Walker testified previously

21   that he held her and he moved her body, so --

22           MR. FARAG:  I think the other thing is the natural

23   inference from the photograph -- and this -- just to be clear,

24   this is the only photograph we have any objection to.  The --

25   the inference here is that someone's going to see this and

1      immediately associate those bullet effects behind her body

2      with that being something the defendant is charged with.  None

3      of those are true and actually his trajectories are fairly

4      significantly away from that area.

5              THE COURT:  I'm assuming there are other photos that

6      show that?

7              MR. FARAG:  Yeah.  The other photos are more

8      pertinent to that, and so there's no issue with that.  The

9      primary point for our objection is actually in addition to

10     this particular photograph, within their exhibit list are a

11     handful of WDS body cameras, and we don't know -- it just says

12     WDS clips.  We don't know which segment of those clips they

13     intend to show.

14             THE COURT:  Okay.  One -- one objection at a time.

15     Let's take the photos first and then we'll go to the videos.

16             MR. SONGER:  Your Honor, I think the points that

17     Mr. Byrd raised show precisely why the evidentiary value of

18     these photographs is so high because testimony from

19     Ms. Taylor's boyfriend about their exact positioning, where

20     they went during the shooting, is going to be one of the most

21     important issues in the case.  And this is one of the pictures

22     that will be very important for showing -- I think as he

23     testifies -- he will testify they just immediately stepped out

24     of the bedroom as you see in this picture to this spot in the

25     hallway and he dove into --

1          THE COURT:  So the purpose is to corroborate a

2     witness who's going to be on the stand testimony because

3     they're going to be referring, essentially, to this area?

4          MR. SONGER:  Correct.

5          THE COURT:  Okay.  Let me see the next photo.

6          MR. SONGER:  This one, Your Honor -- I apologize --

7     does not have an exhibit number yet.  We plan to number it not

8     with a double letter.

9          THE COURT:  Thank you.

10          MR. SONGER:  But the specific significance of this

11     photograph will also be for corroborating an important piece

12     of Ms. Taylor's boyfriend's testimony which is -- you can see

13     in the right side of this picture, there's a lip where my hand

14     is where the bedrooms that are off in the top right of this

15     picture are shielded somewhat from -- from the edge of the

16     hallway and he's going to explain essentially why he was not

17     shot by -- where he and Ms. Taylor were standing resulted in

18     her being shot but not him and that's critical for refuting

19     what I expect to be the defendant's story about what he saw in

20     the hallway before he fired.

21          THE COURT:  Okay.

22          MR. FARAG:  My argument with that, Your Honor, is

23     by -- this is the first time seeing this photo, so I did not

24     come with arguments particularly in mind, but in relation to

25     this, there are several other photos that were provided and

1    labeled that provided Mr. Walker the opportunity to address

2    those points of concern and they actually display some of

3    these trajectories that may be pertinent to the defendant.  In

4    this photo, not a single one of those defects or trajectories

5    would even be seen, so I don't know what value it has in

6    relation to that.

7            THE COURT:  Okay.  Are these the only four or do you

8    have another one?

9            MR. SONGER:  There are others in our list which the

10   defense has.  To be clear, they've had this photo for well

11   over a year as well.

12           THE COURT:  But it just doesn't have an exhibit

13   number yet?

14           MR. SONGER:  We just haven't numbered it yet, but

15   they're all of this character.  I think the four of that I've

16   highlighted here are probably the four most significant.  I

17   would want to double-check that, but they would all be of this

18   character.  There's nothing that's going to be an up-close

19   gruesome autopsy photograph or anything like that.

20           THE COURT:  Okay.  Do you have other photos on that

21   exhibit list that you have objection to specifically?

22           MR. FARAG:  The other photos, no.

23           THE COURT:  Okay.  So it's really just 57 and

24   unknown number exhibit?

25           MR. FARAG:  Yeah.

1     THE COURT:  Okay.  All right.  Well, at least half

2     of the objections are gone there.  All right.  Now talk to me

3     about the body cam because it's kind of going to be the

4     same -- I assume it's the same argument, right?

5     MR. FARAG:  Yeah.  A hundred percent same argument.

6     And the way it's described in the exhibit list is just clips

7     from body cam footage.  We don't know what it's going to be.

8     We don't know if it's just going to be theoretically just

9     clips of, you know, close-ups.  That's really what the

10    objection is it's pertinent to.

11    We're not -- we're not assuming that grown adults

12    are going to be -- have the ability to see that.  It's just

13    up-close things that present an unfair and misleading

14    representation or potential for the inference to occur.

15    THE COURT:  Okay.  These clips of which he speaks?

16    MR. SONGER:  Your Honor, we've of course disclosed

17    the body camera video and listed it as an exhibit.  We haven't

18    formulated the exact clips we're planning to use yet.  That

19    will be somewhat dependent, I think, on witness prep, but they

20    will depict the same scene that we've seen in these pictures

21    and they're certainly not unfair.  There's a video taken of

22    the apartment shortly after the shooting happened.

23    THE COURT:  Okay.  Presumably with Ms. Taylor still

24    in it?

25    MR. SONGER:  Correct.  Positioned as she is in these

1    pictures.

2            THE COURT:  Okay.  All right.  Not -- again, I'm

3    more of a fact-based finder here.  I don't find any of those

4    four pictures to be objectionable from the standpoint that

5    they are unfairly prejudicial or that they show anything

6    particularly gruesome or up close or anything of that nature.

7            To the extent that you can never really know what

8    anybody is going to say on the witness stand and exactly how

9    they're going to be used, I obviously can't say anything about

10   that, but from the sheer motion perspective of something that

11   is completely irrelevant, they are not completely irrelevant.

12   They show what we're all here talking about.

13           In every crime scene, not every inch of the crime

14   scene is relevant to every crime or every person involved, so

15   I think the crime scene as a whole is relevant to the extent

16   that there's going to be a lot of trajectory talk and things

17   of that nature.  I think all photos -- especially because I am

18   probably going to deny any interior review -- the photos are

19   going to be helpful and assist the jury, and I don't think any

20   of these are objectionable to the extent that I find them

21   unfairly prejudicial.

22           So those four -- I don't have any problem ruling on

23   those four that they are appropriate.  To the extent that

24   there are videos, I haven't seen the videos, so it's hard to

25   tell, but to the extent they are showing the scene as a whole,

1    I don't think that is objectionable.  To the extent that

2    we're, like, up-closing things to see people's faces or

3    particular features, that is probably not necessary in this

4    case because it's really more about the trajectories and the

5    surroundings as a whole, so I can't obviously rule on those

6    specifically, but generally speaking that would be my ruling

7    at trial on the use of those videos.

8         If you review them and you come to something ahead

9    of time, I'm happy to look at them ahead of time as part of

10   the exhibits that you turn in, okay?  So that will be the

11   ruling on 57.

12        Now we move to the United States' motion, Docket

13   Entry 49, motion in limine to exclude improper references to

14   civil suits and judgments.

15        MR. SONGER:  Your Honor, I think the argument's

16   adequately set out in our briefing.  I'm happy to answer any

17   questions you have.

18        THE COURT:  Response?

19        MR. BYRD:  We have no intention of violating any

20   rules that are in place with the court or any such, so we

21   didn't respond to that.  We're not going to violate the rules.

22        MR. SONGER:  Your Honor, I guess follow up to that,

23   what we would ask is just for an order clarifying that in the

24   state case defense counsel explicitly made the argument that a

25   civil -- a pending civil lawsuit filed by one of the victims

1    would go a long way towards making them whole for what

2    happened to them which I think is an improper invocation, a

3    pure jury nullification argument.  It's not relevant to the

4    credibility which would be the only permissible purpose to use

5    the civil judgment for.

6        MR. BYRD:  Your Honor, obviously the fact that

7    there's a pending civil case for a witness is an issue of

8    bias, and I think that goes into their other motion, but if a

9    witness is on the stand and they've got a multimillion dollar

10   lawsuit pending, that goes to bias and we should be allowed to

11   inquire about that.

12       MR. SONGER:  The government agrees.  If a witness

13   testifies, certainly they can be cross-examined on sources of

14   bias including any pending civil lawsuits, but what happened

15   in the state case is -- not permissible is to suggest that the

16   victims have already been compensated for what happened to

17   them.  I would like a rule that that is improper and won't

18   happen again here.

19       THE COURT:  Do you have any problem with that?

20       MR. BYRD:  No.

21       THE COURT:  That will be the ruling.

22       MR. FARAG:  I was going to say, Your Honor, if we

23   could get a point of clarification.  I just want to make sure

24   I'm understanding.  Is the contention that there should be no

25   reference to the civil proceeding whatsoever in the closing

1    arguments in general, is that the conclusion, or is that in

2    regards to that --

3            THE COURT:  If it is a point of bias from a specific

4    witness, you can say that they're biased because of the civil

5    suit.  What you can't say is they're already getting their day

6    in court and they're getting satisfied by it.

7            MR. FARAG:  Understood.  Completely understood.

8    Thank you.

9            THE COURT:  All right.  That takes cares of 49.

10   Docket Entry 50, United States' motion in limine to prohibit

11   references to and argument about equally available witnesses.

12   Everyone except the FBI employees is equally available to the

13   defendant.  I'm not totally -- are there specific witnesses

14   we're talking about?  What is the crux of this?

15           MR. SONGER:  Your Honor, just -- the crux of this is

16   just there are a whole bunch of potential witnesses in this

17   case, you know, officers who had some level of involvement.  I

18   expect the government will call some of them but not every

19   single one of them.  And since those witnesses are equally

20   available for either party to subpoena and bring in to

21   testify, there shouldn't be argument about that.  There

22   shouldn't be references to -- that the government --

23           THE COURT:  You didn't bring in so and so.

24           MR. SONGER:  Yeah.  The government failed to put so

25   and so in front of you when the defense had an equal chance to

1    do that.

2         MR. BYRD:  There's no objection to that, Your Honor,

3    unless it's brought forth that this witness said specific or

4    did specific or participated in specific things and actions.

5    At that point, if the government fails to call that witness in

6    their case-in-chief but they're referring to it, we should be

7    able to tell the jury, "They didn't call them.  They told you

8    this, but they didn't call them.  You didn't hear from them."

9    So if they don't reference the individual, then I think that's

10   a legitimate motion.

11        THE COURT:  So let's just say Officers X, Y, and Z

12   were all at the scene and they call X and Y, but they don't

13   call Z, but somebody says Z was next to me at the scene.

14        MR. BYRD:  If the government solicits testimony that

15   says Z picked up the body and moved it, of a specific type of

16   testimony, then -- or Z told me -- it was hearsay-type

17   testimony, then we should be able to argue to the jury, "They

18   didn't call Z to tell you this happened."  If they don't

19   solicit and open that door, then yes I believe it's a

20   legitimate motion, but what their witnesses say from the

21   stand, we can't control.

22        MR. SONGER:  Your Honor, either party has an equal

23   ability to put Officer Z on the stand in this scenario, so

24   neither party should be able to argue that the other side --

25   there should be some inference drawn from the other side

1    failing to do that.

2           THE COURT:  I understand the motion.  I mean, some

3    of these types of motions are very hypothetical.  Not only can

4    you not, you know, control what his witness says from the

5    stand, he probably can't either to some extent.

6           If we get to that issue and that becomes something

7    we want to talk about later on, I think we can.  Right now I'm

8    assuming you all are subpoenaing everybody.  That's part of

9    what happens in these cases, so we'll see if we get to that

10   point in time, but I understand -- understand the motion.

11          Docket Entry 51, United States' motion in limine to

12   prohibit references to defendant's state trial.  Have we --

13   have we eliminated any argument on that?

14          MR. FARAG:  No objection to my understanding.

15          THE COURT:  No objection?  That one's moot.  All

16   right.  Docket Entry 52, United States' motion in limine to

17   exclude evidence and argument about two irrelevant rifle shell

18   casings.  This seems like the big motion of all of them.  I

19   mean, this seems like the most contested of all of them, so do

20   you want to argue that?

21          MR. SONGER:  Certainly, Your Honor.  I think the

22   argument's pretty simple.  Those two shell casings we know are

23   not connected to the events in this case.

24          THE COURT:  How do you know that?

25          MR. SONGER:  Because they don't -- they do not match

1     any weapon that was recovered from the scene.  They were not

2     matched in any weapon that was recovered from the scene and no

3     projectile or bullet recovered anywhere in the scene that

4     matched the casings either, so wherever they came from, it

5     wasn't the shooting that happened that night.

6              So bringing them into this case would just create a

7     prejudicial distraction -- it would, frankly, I think cause a

8     bit of a mini trial where if they came in, the government

9     would call additional witnesses to explain what I just talked

10    about; why these weren't -- these were tested, they weren't

11    matched to any weapon, they weren't matched to any projectile,

12    that they weren't turned up in any search that happened that

13    night.  It would create a focus on these completely irrelevant

14    casings that would risk prejudicing the jury and wasting

15    everybody's focus and attention.

16             THE COURT:  What about the argument that there's one

17    inside the apartment and then one outside the apartment and

18    they're from the same firearm?  And what about the argument

19    that those firearms -- or that firearm may have been inside

20    the apartment?  Because that sounds like -- just from reading

21    things, that sounds like the question of it's not necessarily

22    that the bullets were involved that night, but it may have

23    been that the firearm was.

24             MR. SONGER:  There's no evidence that there was a

25    firearm inside that night.  The home was searched.  There will

1  be testimony from multiple people that will say no weapon that

2  would match those casings was recovered that night.  There was

3  a weapon found, you know, very easily in plain view that was

4  matched to the bullet and the one shot that was fired, but

5  there was no other weapon found, so who knows how long those

6  casings had been there, but they weren't relevant to the

7  events that happened that night.

8       THE COURT:  And are there any bullet holes that were

9  unaccounted for as far as where they came from?

10      MR. SONGER:  There are no bullet holes that were

11  unaccounted for that would match that type of ammunition --

12  that would match, you know, a rifle round fired anywhere.

13      THE COURT:  Okay.

14      MR. MATHEWS:  Your Honor, our motion -- or our

15  response to it includes our argument.  The problem is we can't

16  prove a negative in the sense that there was no rifle found,

17  but there certainly is a lot of circumstantial evidence that

18  indicates perhaps there was one there.

19      And the things that -- the two shell casings

20  corroborate to some extent the fact that at some point there

21  was a rifle of that nature in or near that apartment.  And,

22  you know, I don't know whether it was fired that night or not,

23  but Mr. Songer is correct, there is no evidence that was -- of

24  any bullet recovered.  As far as the statement that there are

25  no bullet holes that would match that type of bullet, I don't

1    know that, but I think there is enough circumstances

2    surrounding these shells that give them some probative value.

3              THE COURT:  And the circumstances surrounding the

4    shells are you searched the apartment, but you didn't find the

5    shell?

6              MR. MATHEWS:  Allegedly they searched the apartment.

7    Ju'Niyah Palmer, the sister of the deceased, who lived in one

8    of the bedrooms indicated that her bedroom was not searched --

9              THE COURT:  Was this bullet found in the bedroom?

10             MR. MATHEWS:  -- which is where one of the shell

11   casings was found.

12             MR. SONGER:  That's just wrong, Your Honor.  Her

13   bedroom was searched.  There's testimony from multiple

14   officers about searching it.  There's pictures of them

15   searching it.

16             THE COURT:  Okay.  Let me ask this question.  The

17   three photographs that were in the motion itself -- or in the

18   response -- my apologies, the three photographs, were those

19   photographs in Mr. Hankison's possession prior to the raid?

20             MR. MATHEWS:  No.  Those photographs I believe were

21   recovered from Mr. Walker's cell phone --

22             THE COURT:  Okay.

23             MR. MATHEWS:  -- after the -- after the fact.

24             THE COURT:  Okay.  All right.  All right.  I think I

25   understand the motion.  I will -- and that's the last motion I

1    have, is that correct --

2         MR. FARAG:  Yes, Your Honor.

3         THE COURT:  -- there's nothing else filed?  So we'll

4    expect another one -- at least one coming.  And then after you

5    review the videos, if there's another one after that, I can

6    probably take that up the Friday of.  If you're going to

7    object to the videos, then just bring the videos and I'll deal

8    with that.  Otherwise, we'll get out something written on the

9    ones that aren't moot.  The ones that are moot, I'll probably

10   just put in a memorandum from today's proceeding, but the ones

11   that haven't, I'll put rulings in writing on -- on those.

12        All right.  With that, anything else that I have

13   failed to cover?  Anything else you want to know before --

14        MR. BYRD:  Your Honor, and I hate to back step a

15   little bit, but one other thing that is pertinent to those

16   shell casings is there will be multiple witnesses --

17        THE COURT:  That talk about them?

18        MR. BYRD:  -- that talk about it sounded like rifle

19   fire and pistol fire.  One of those is an unbiased civilian

20   witness that is a combat veteran, so there's a little bit more

21   to that, and it was included in the motion, but I wanted to

22   point that out for the court.

23        MR. FARAG:  If I could just add on to what Jack was

24   saying, it's worth noting that there was a subsequent search

25   conducted on the house three months -- or rather the apartment

1    three months later that yielded 17 new pieces of evidence

2    including 16 projectiles, things of that nature, that were not

3    recovered initially during the search.

4              And on top of that, during the course of that second

5    search, there are significant segments, chunks, and there were

6    pictures captured of the apartment that were removed, so how

7    can we speak to what bullet defects were or were not present

8    that night?  And, again, they yielded --

9              THE COURT:  I'm sorry.  You're going to have to help

10   me.  Part of the wall was removed?

11             MR. FARAG:  Yeah.  Like, they -- so maybe -- I've

12   been reading too many reports.  I keep using all that jargon,

13   but there were, like, literally segments -- significant

14   portions of the ceiling, the walls, removed throughout the

15   apartment during the time the second search warrant was

16   conducted three months later, and despite that, they found 17

17   pieces of new evidence including 16 that were, like,

18   projectile related.

19             THE COURT:  Okay.

20             MR. FARAG:  So my point is over that period of time

21   who's to say there wasn't a hole that matched that, you know,

22   different caliber round.  Does that make sense?

23             THE COURT:  Yeah.  Go ahead.

24             MR. FARAG:  And there were --

25             MR. SONGER:  The physical pieces of the walls and

1    ceiling were removed by evidence collection teams to enable

2    them to take projectiles.  Those were all examined and none of

3    them had rifle holes in them.  We do know that.  There are

4    witnesses who will say the echoing sound of the shooting

5    sounded like rifle fire, but it actually highlights why I

6    think this piece of evidence is so prejudicial.

7            The one thing we know of evidentiary certainty,

8    those shell casings were not fired.  They did not contribute

9    to that sound, so introducing them would be very misleading in

10   this context.

11           MR. FARAG:  The statement about all those holes

12   occurring just to retrieve that evidence is patently

13   incorrect -- or patently incorrect.  The FBI reports

14   themselves actually state it should be noted there were

15   several panels of drywall that were removed from the apartment

16   during the course of making repairs and doing things of that

17   nature, so that's really my only point of contention.

18           THE COURT:  During the second search warrant?

19           MR. FARAG:  Prior to.

20           MR. BYRD:  No, Your Honor.  There were repairs made

21   to the apartment before the FBI went in to do their second

22   search and recover portions.

23           THE COURT:  Right.  But prior to the -- if I'm

24   understanding the time line right, the pieces of wall were

25   removed prior to the second search warrant?

1          MR. FARAG:  Yes.

2          MR. SONGER:  Your Honor, I believe they were removed

3     at the time of the second evidence collection was conducted by

4     the FBI -- as part of that second search warrant.

5          THE COURT:  And had somebody patched holes in the

6     interim?

7          MR. SONGER:  I'm -- I'm not a hundred percent sure.

8     There will be testimony about that at trial.

9          MR. FARAG:  There were -- in addition to there being

10    holes patched, the report literally states, (Reading) There

11    were clear panels removed prior to our arrival and other

12    repairs that had been performed.

13          That is not in dispute.  That's there.  Now, I don't

14    disagree with this, there were additional panels and things

15    removed from the apartment over the course of that evidence

16    collection, but that's not what I'm referring to.

17          MR. SONGER:  Bottom line here is that the evidence

18    is only relevant to the extent it's relevant to the

19    defendant's state of mind at the time he fired.  He wasn't

20    aware of these casings at the time he fired.  There's no

21    evidence those casings were fired at any point during the

22    incident, so it's going to be irrelevant and prejudicial.

23          THE COURT:  All right.  I understand the motion.

24    Anything else?  Any other motions?  Anything else you would

25    like to know in advance, no?

1          MR. SONGER:  Nothing further from us.  Thank you,

2    Your Honor.

3          THE COURT:  Okay.  All right.  Well, then we will go

4    ahead and expect a little bit more from you by the 10th.  I

5    think my primary concern and primary request is that you all

6    go ahead and think about those questionnaires as quickly as

7    possible.  If you're prioritizing your list of things, I would

8    prefer that be on the top of your priority list just because

9    the sooner we finalize those, the sooner they go out and the

10   sooner the jurors have those able to be returned.

11         MR. SONGER:  So on that point, Your Honor, just from

12   a process standpoint, should we wait to get the updated

13   version from you or --

14         THE COURT:  No.  Go ahead.  I'd like to get you an

15   updated version after I get more feedback.  I'm going to work

16   on feedback and review it, but I'm -- I want to be able to

17   include anything else so that the draft I send you is a little

18   more final, so -- but I would like to see anything else from

19   you by I think I said 10th.  Okay.  All right.  Thank you all.

20   (Proceedings concluded at 4:21 p.m.)

21                  C E R T I F I C A T E

22      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

23   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

24

         s/April R. Dowell                    April 22, 2025
25   Official Court Reporter, RMR, CRR         Date